14-2614 BPG ✓ 14-2615 BPG

## AFFIDAVIT UNDER SEAL IN SUPPORT OF AN
## APPLICATION FOR A SEIZURE ORDER

Your Affiant, Kalliopi Tserkis-Mullins, being duly sworn, deposes and states the

following:

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

DEC 2 2 2014

AT CALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

### INTRODUCTION

1. I am currently a Postal Inspector with the United States Postal Inspection Service and have been so employed since June 2002. I previously worked as a Police Officer with the Department of Defense, National Security Agency for 3 years. I'm currently assigned as a Postal Inspector with the Maryland Fraud Team in the Washington Division. In that capacity, your affiant investigates criminal allegations of mail fraud, wire fraud, and money laundering. I also have completed the sixteen-week Postal Inspector Basic Training Course at the Postal Inspection Service Academy in Potomac, Maryland. In August 2009, I completed a training course in Mortgage Fraud.

2. From 2002 through 2007, your affiant investigated various crimes against children, was the affiant on numerous child exploitation search and arrest warrants, and received extensive training in that field during that time frame. As a United States Postal Inspector, I have received extensive training concerning investigations involving violations of federal laws including thefts and misappropriation of monies, postal money orders, mail fraud, prohibited items placed in the United States mails. This training focused on introductory investigative skills required to conduct successful investigations of Federal violations which include probable cause, search, and seizure techniques.

**PROBABLE CAUSE**

3. Your affiant and other federal agents with the Federal Bureau of Investigation ("FBI"), Internal Revenue Service-Criminal Investigations ("IRS-CI"), and Homeland Security Investigations ("HSI") are conducting a criminal investigation into Jeffrey B. Cohen (COHEN) and his associated business entities.

4. Federal agents have determined that Cohen currently has a life insurance policy in his name with a monetary value in Cincinnati Life Insurance Company, account number 6367142K. On or about November 6, 2013, COHEN caused a check to be issued payable to Cincinnati Life Insurance Company in the amount of $250,000 from a Manufacturers and Trading Bank account ending in #3886, which lists Defendant Jeffrey Cohen and his wife, Crystal Cohen as signatories. The memo line of the check stated that it was for "Annuity Jeffrey B Cohen," and included the number 6367142. Federal agents have identified the bank account ending in 3886 as having received at least $305,000 from accounts relating to IDG Companies LLC traceable to the fraud as of November 2013. Additionally, approximately $150,000 from COHEN and Crystal Cohen's Susquehanna Bank account ending in 6436 funded the Manufacturers and Trading account ending in 3886. COHEN's and Crystal Cohen's Susquehanna Account ending in 6436 was funded with at least $285,000 proceeds of the fraudulent activity from January 2010 through December 2012. Your affiant has confirmed with Cincinnati Life Insurance Company that this policy has a current value of approximately $250,000 that should be seized in aid of forfeiture.

5. On or about December 23, 2011, Crystal Lynn Cohen purchased a 2012 Infiniti G37 coupe, VIN # JN1CV6FE0CM200056, from Nationwide Motor Sales Corporation for

2

$50,700.00[1]. Approximately $20,000 in funds used for this purchase came from bank accounts into which proceeds flowed from the crimes charged in the Superseding Indictment.

6. Your affiant's investigation has revealed that on or about December 23, 2011, COHEN's American Express account ending in 6007 paid $5,000 to Nationwide Motor Sales, located in Timonium, Maryland. Cohen would routinely pay this account balance with funds from Cohen's PNC account ending in 2212. On or about December 27, 2011, Cohen's PNC account ending in 2212 paid approximately $15,000 to Nationwide Infiniti. COHEN's PNC Account ending in 2212 was funded by deposits of fraudulent proceeds from bank accounts belonging to Indemnity, IDG Companies (IDG), and RB Entertainment. COHEN has a business interest in Indemnity, IDG, and RB Entertainment as shown in attached Exhibit 1 (previously sworn affidavit, especially Footnote 1), and Exhibit 2, Superseding Indictment, Count 1, ¶21.

7. Your affiant has spoken with other case agents familiar with the analysis of the flow of money in connection with the Jeffrey Cohen investigation. These agents and their analysts have identified funds traceable from the frauds charged in the Superseding Indictment. COHEN's PNC Account ending in 2212 was funded with at least $552,000 of proceeds of the fraudulent activity.

8. Most pertinently for this seizure warrant, the Superseding Indictment includes forfeiture allegations. In connection with the wire fraud charges, the Indictment alleges that Cohen "shall forfeit to the United States all property, real or personal,

---

1     Your affiant's investigation has revealed that Crystal L. (Ambrose) Cohen earned income in the amount of at least $26,000 from employment prior to her marriage to COHEN.

which constitutes or is derived from proceeds traceable to the offense, including $100,000,000 and all interest and proceeds traceable thereto." In connection with the money laundering charges, the Superseding Indictment alleges that Cohen "shall forfeit to the United States any and all property involved in and traceable to the property involved in such offenses, including $866,667.67 and all interest and proceeds traceable thereto." Regardless of whether property is traceable to the offenses charged, the Superseding Indictment alleges that the United States is seeking "forfeiture of any other property of the defendant up to the value of $100,866,666.67." A copy of the Superseding Indictment is attached hereto as Exhibit 2.

9. Wherefore, your affiant submits that there is probable cause to believe that the items listed in Attachments B1 and B2 constitute assets subject to seizure in aid of forfeiture.

14-2614 BPG      14-2615 BPG

## CONCLUSION

10. Wherefore, I respectfully ask this Court to issue seizure warrants for the following

items listed in Attachments B1 and B2.


I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

_____
Kalliopi Tserkis-Mullins
Postal Inspector
U.S. Postal Inspection Service


Subscribed and sworn to before me.

_11 - 12 - 14_
DATE

_____
The Honorable Beth P. Gesner
United States Magistrate Judge

_4: 15 pm_
TIME

14-1038SAG

## AFFIDAVIT IN SUPPORT OF A SEARCH & SEIZURE WARRANT

Your affiant, Jennifer L. Perry, being duly sworn, deposes and states the following:

Based on the facts set forth in this affidavit, I submit that there is probable cause to believe that a search of 950 Ridgebrook Road, Suite 1500, Sparks, Maryland, which is described in greater detail in Attachment A to this search warrant application, will uncover the evidence, fruits, and/or instrumentalities described in Attachment B, relating to 18 U.S.C. Section 1349, conspiracy to commit mail and wire fraud, and 18 U.S.C. Section 1033, which imposes criminal penalties for materially false statements to an insurance regulator made with an intent to deceive by a person engaged in the interstate insurance business.[1]

Since this affidavit is being submitted for the limited purpose of seeking a search warrant, I have set forth only the facts that I believe are necessary to establish probable cause, not each and every fact known to me concerning this investigation. The information contained in this affidavit is based upon your affiant's personal knowledge, review of documents and/or other evidence, conversations with other law enforcement officers, as well as other individuals. All conversations and statements described in this affidavit are related in substance and in part, unless otherwise indicated.

## AFFIANTS' EXPERTISE

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been employed as such since June 11, 2006. While performing my duties as a Special Agent with the FBI, I have participated in numerous investigations of violations of Federal statutes, including bank fraud, securities fraud, mail fraud and wire fraud, which involve criminal activities within the purview of the jurisdiction of the FBI. I have attended several trainings related to "white

---

[1] See United States v. Natale, 719 F.3d 719, 739 (7th Cir. 2013); United States v. Renzi, No. 08-212-TUC, 2010 WL 2080098, at *2 (D. Ariz. May 14, 2010).

1

Exhibit 1

collar crime" investigations, including financial institution fraud, mortgage fraud, securities fraud and bankruptcy fraud. I have participated in numerous investigations of criminal activity and have participated in several arrests and search warrants related to white collar crime investigations. As a federal agent, I am authorized to investigate violations of laws of the United States and I am a law enforcement officer with the authority to execute arrest and search and seizure warrants issued under the authority of the United States.

2.     The facts set forth in this affidavit are based upon my personal knowledge, knowledge obtained during my participation in this investigation, knowledge obtained from other individuals, including but not limited to Special Agents of the Internal Revenue Service, Homeland Security Investigations, and the U.S. Postal Inspection Service as well as based on your affiant's training and experience. The affidavit is submitted for the limited purpose of establishing probable cause in support of this application for a search warrant, and thus, it does not contain every fact known by me or federal agents working on this investigation.

## OVERVIEW OF INVESTIGATION

3.     Your affiant and other federal agents with the U.S. Postal Inspection Service ("USPIS"), Internal Revenue Service-Criminal Investigations ("IRS-CI"), and Homeland Security Investigations ("HSI") are conducting a criminal investigation into Jeffrey Cohen (hereinafter referred to as "COHEN"), Indemnity Insurance Corporation RRG (hereinafter referred to as "IICRRG"),[2] and others yet unknown. From 2010 to 2013, COHEN was the President and

---

[2] COHEN owns RB Entertainment Ventures, Inc. ("RB Entertainment"), which is a 99% owner of IICRRG. Other entities related to or associated with IICRRG include but are not limited to the IDG Companies, LLC ("IDG"), Indemnity Insurance Corporation of DC RRG ("IICDCRRG"), The Agency, LLC ("TAL"), International Associated of Entertainment Businesses, Inc., and NI Agency, LLC. Until May 2013, COHEN controlled all of these entities, either directly or indirectly. According to the Supreme Court of Delaware, COHEN owned and controlled "a complicated web of at least seventeen different companies."

Chairman of the Board of IICRRG.[3]  IICRRG provides general liability, liquor liability, excess liability coverage to policyholders in the entertainment industry, including nightclubs, concert tours, and special events.  IICRRG is approved to operate in 38 states and the District of Columbia.  IICRRG is a heavily regulated entity.  IICRRG insures approximately 4,000 policyholders, and wrote over $35 million in premiums during the 2012 calendar year.

4.      As further discussed below, your affiant and other federal agents have uncovered evidence that COHEN and IICRRG knowingly devised a scheme or artifice to defraud multiple individuals and entities of money and property and to commit and conceal this fraud, engaged in material misrepresentations with respect to IICRRG's financial status to A.M. Best,[4] the financial auditors for IICDCRRG and IICRRG, state insurance regulators in the District of Columbia[5] and Delaware,[6] and numerous insurance customers that relied upon the financial status of IICRRG in obtaining insurance coverage.  Based on the investigation to date, federal agents have identified at least four material misrepresentations regarding the financial status of IICRRG:  (A) a $47 million letter of credit for IICDCRRG supposedly from BNP Private Wealth Advisors; (B) approximately $7 million of revenue that IICRRG appears to have fraudulently "purchased" by borrowing the money and creating fake premium payments from fake customers; (C) a fake $10 million capital contribution by COHEN in 2009; and (D) a fake $5 million in unencumbered cash IICRRG allegedly had on deposit at Susquehanna Bank in 2012.

---

[3] COHEN was President and Chairman of the Board of IICDCRRG, which your affiant understands was the predecessor company to IICRRG.

[4] A.M. Best is a well-known financial rating corporation.

[5] From in or about 2004 to 2010, IICDCRRG (formerly Capital Specialty Insurance Risk Retention Group) operated in and was regulated by the District of Columbia.

[6] IICRRG is a risk retention group domiciled in the State of Delaware and regulated by the State of Delaware-Department of Insurance ("Delaware DOI").  Its principal place of business is 950 Ridgebrook Road, Suite 1500, Sparks, Maryland.

5.      In or about June 2012, Delaware regulators conducted an examination of IICRRG. This

examination raised serious questions about the financial status of IICRRG. On or about May 31,

2013, the Insurance Commissioner of the State of Delaware filed a Verified Petition for Entry of

Confidential Seizure and Injunction Order alleging financial irregularities at IICRRG caused by

multiple acts of fraud committed by COHEN. Thereafter, the Delaware Court of Chancery

entered an order authorizing the Commissioner to take control of IICRRG and its assets.

6.      From May 2013 to the present time, there has been extensive litigation between the

Delaware Insurance Commissioner, COHEN and IDG regarding IICRRG. This litigation has

included multiple evidentiary hearings in the Delaware Court of Chancery and resulted in

multiple court opinions. See, e.g., In re Rehabilitation of Indemnity Insurance Corp., Misc. No.

14-49 (attached hereto as Exhibit 1).[7] In August 2013, COHEN was removed as President of

IICRRG, but according to the Court of Chancery, COHEN continued to be involved in IICRRG

activities.[8]

7.      On April 9, 2014, the Delaware Supreme Court issued a 54-page opinion affirming

multiple orders issued by the Court of Chancery, and concluding, among other things, that the

lower court's opinions had not violated the due process rights of COHEN or RB Entertainment.

A copy of that opinion is incorporated herein as Exhibit 2.

8.      The principal business location of IICDCRRG from approximately 2007 to 2010, and the

principal business location of IICRRG from 2010 to the present time, has been 950 Ridgebrook

---

[7] Among other statements, the Delaware Court of Chancery has stated that "[t]he effect of
Cohen's fraud was to mask a shortfall in policyholder surplus of at least $10 million."
[8] The Delaware Court of Chancery's opinions have detailed how COHEN allegedly obtained a
surreptitious audio recording of a meeting held at IICRRG, attempted to shut off utilities at the
business, used vehicles to block the entrance to the IICRRG's offices, engaged in financial
transactions contrary to the court's orders, continued to contact IICRRG's employees, and
accessed or made attempts to access IICRRG's computer systems after his removal from the
company. The court has stated that COHEN has engaged in nine different violations of its orders
and has imposed civil sanctions on COHEN for these acts.

Road, Suite 1500, Sparks, Maryland. Based on federal agents' conversations with the representatives of the Delaware Insurance Commissioner, specifically attorneys handling the court ordered receivership, your affiant knows that numerous records pertaining to the crimes under investigation, including documents and electronic data for IICRRG and other COHEN affiliated entities, are currently at the location identified in Attachment A.

## STATEMENT OF PROBABLE CAUSE

### A. False Representations To A.M. Best Regarding $47 Million Letter of Credit.

9.      In early 2008, IICDCRRG submitted certain documents to A.M. Best for the purpose of obtaining a "rating." A.M. Best is a global credit rating agency with a focus on the insurance industry. Insurance professionals, brokers, regulators and consumers refer to A.M. Best's credit ratings as an opinion of the financial strength and creditworthiness of risk-bearing entities. The rating includes an analysis of an insurer's financial strength, its ability to meet its ongoing insurance obligations, and its policyholder surplus relative to company size.

10.     In April 2008, A.M. Best announced that it had assigned IICDCRRG an "A-" or "Excellent" in the financial strength category (called the FSR) and a level "VII" in the financial size category (called the FSC), reflecting policyholder surplus of $50,000,000 to $100,000,000. A.M. Best noted that its ratings reflected audited financial data and/or other information provided to it.

11.     On or about February 24, 2009, IICDCRRG issued a press release advising that it had been upgraded from an FSC of "V" to "VII" by A.M. Best. Your affiant cannot explain why this announcement was made as, according to A.M. Best, IICDCRRG had already been rated at a "VII."

5

12.    On May 27, 2009, BNP Private Services Private Wealth Advisors, Ltd. ("BNP"), 1155
Rene Levesque Blvd., Montreal, Quebec H3B2K4, purportedly issued an Irrevocable Letter of
Credit, Number BPW700-11A-IIC-1, in the favor of IICDCRRG up to the aggregate amount of
$47,000,000. The Letter of Credit was directed to the Commissioner of the Department of
Insurance, Securities and Banking ("DISB"), which is part of the District of Columbia
government. The Letter of Credit expired at the close of business on December 31, 2009. The
letter was signed by ███████████, Executive Director, telephone 305-728-5331.

13.    Federal investigators also have obtained a bank statement from the files of A.M. Best
purportedly from BNP Paribas reflecting that LMNH Inc. ("LMNH") had a closing balance in
Account Reference No. ███████8008 of $47,595,968.95 as of January 31, 2009.[9]  LMNH
was a holding company for the risk bearing entities that COHEN operated, including
IICDCRRG, that were being reviewed by A.M. Best. COHEN owned LMNH and your affiant
submits that financial misrepresentations regarding LMNH could have affected A.M. Best's
analysis and rating of IICDCRRG.

14.    On June 11, 2009, A.M. Best issued another Credit Report which affirmed IICDCRRG's
ratings as an FSR of "A-" and an FSC of "VII."

15.    A.M. Best issued several statements in 2009 regarding its rating of IICDCRRG. The
cumulative effect of these statements was to note the importance of IICDCRRG having the
appropriate capitalization and meeting insurance regulators' requirements.

16.    In A.M. Best's December 16, 2009 Credit Report, it supported an FSR of "A-," but
downgraded the company's FSC to a "V," as a result of the letter of credit being removed.

---

[9] Also included within these documents is a prior month statement for December 2008, showing
a balance of $12,577,460.73.

17.     In or about February 2010, COHEN and IICDCRRG submitted a confirmation form regarding the $47 million letter of credit to IICDCRRG's auditor, Marcum LLP.  The form indicated that BNP, supposedly located at 701 Brickell Avenue, Suite 1550, Miami, FL 33131 confirmed the letter of credit, Account No. BPW700-11A-IIC-1, in the amount of $47 million. The form was purportedly signed by ▓▓▓▓▓ Executive Director on February 3, 2010. Marcum's notes reflect that it received the form via U.S. Mail from BNP.

18.     Your affiant's investigation has revealed that 701 Brickell Avenue, Suite 1550, Miami, Florida 33131 is the address for Office Edge.  Office Edge has provided federal agents with documents showing that on or about May 12, 2009, it leased a virtual office to "BNP Private Wealth," at the request of "Jeff Cohen," with an address of 2419 Long Ridge Road, Reisterstown, Maryland, 21136, a listed phone number of 410 472 6000, and an email address of jcohen@IICDC.com.  Under the billing section, the documents list Jeffrey Cohen's Visa card and the IICDCRRG business address of 950 Ridgebrook Road, Sparks, MD 21152.  The records also include a form showing that ▓▓▓▓▓ was listed as a VP with BNP Private Wealth, and that the extension for the company was "5331." [10]

19.     In March 2010, a Director in the Legal Department of BNP Paribas ("Director#1), wrote a letter to DISB.  Director#1 stated that BNP Paribas had no business relationship with IICDCRRG.  Director#1 further noted that the name of the issuer of the Letter of Credit, "BNP Private Services" or "Private Wealth Advisors Ltd.," was suspiciously similar to and could easily be confused with BNP Paribas and the BNP Wealth Management division in Miami.

20.     Director#1 stated that on February 2, 2010, within minutes of receiving a copy of the Letter of Credit from third party counsel, COHEN called Director#1 to say that the Letter of Credit was issued by IICDCRRG's private equity manager (a man named ▓▓▓▓▓sp)) and

---

[10] The name, address, and contact number match the letter of credit referenced above.

that IICDCRRG never intended to represent that BNP Paribas issued a Letter of Credit for the benefit of IICDCRRG or provided any other financing to IICDCRRG or that BNP Paribas holds any assets of IICDCRRG. COHEN further told Director#1 that he has no banking relationship whatsoever with BNP Paribas.

21.     In February 2014, another representative of BNP Paribas (Representative#2) wrote to a representative of the Delaware Insurance Commissioner regarding the alleged $47 million letter of credit. Representative#2 stated that BNP Paribas had no record of a relationship with IICDCRRG (referred to as "IICDC" in the letters from Director#1 and Representative#2), nor any record of issuing a letter of credit under the number "BPW700." Representative#2 further stated (a) ▓▓▓▓▓▓▓ has never been employed by BNP Paribas; (b) neither BNP Paribas nor any of its affiliated entities has ever owned or used the telephone number listed for Regis, 305-728-5331; and (c) neither BNP Paribas nor its affiliated entities has ever used or owned the business address 701 Brickell Avenue, Suite 1550, Miami, Florida 33131 or 1155 Rene Levesque Blvd, Montreal, Quebec H3B2K4.[11]

     B. COHEN's Use Of First Insurance To "Purchase" Millions In Revenue.

22.     Your affiant has obtained information in this investigation from a confidential source (hereinafter "CS1"). CS1 worked at IICDCRRG and IICRRG and was a member of the Board of Directors at one point. CS1 stated that in or about 2010, CS1 had a conversation with COHEN regarding IICDCRRG's financial reporting for the fiscal year ending 2009. According to CS1, CS1 confronted COHEN about premium financing arrangements IICDCRRG had obtained from

---

[11] The letter did note that BNP Paribas (Canada)'s outside counsel has offices at this address and, routinely, mail intended for BNP Paribas (Canada) arrives at this address and is forwarded to BNP Paribas (Canada)'s Montreal Office.

First Insurance Funding ("First Insurance"). COHEN admitted that COHEN had obtained premium financing during 2009 because IICRRG was short on working capital.

23.     First Insurance is a premium finance company which lends funds to persons or companies to cover the cost of insurance premiums. To finance a premium, the individual or company requesting insurance must sign a premium finance agreement with the premium finance company. The loan arrangement may last from one year to the life of the policy. The premium finance company then pays the insurance premium and bills the individual or company, usually in monthly installments, for the cost of the loan.

24.     CS1 had been approached by ▓▓▓▓▓▓▓ ("Employee#1"). Employee#1 expressed concern about a $1 million wire Employee#1 sent at COHEN's request to another company, which according to CS1 might have been Monahan and O'Brien. Employee#1 also asked CS1 about $1 million in premium financing that IICDCRRG had received from First Insurance.

25.     CS1 then started to look into the situations. CS1 determined that IICRRG had supposedly issued 10 policies for $100,000 each, using premium financing from First Insurance. CS1 then checked a log of policies issued by IICRRG and did not find the policies. No newly written policies had been logged into the system as being financed by First Insurance Funding. At this point, CS1 suspected wrongdoing.

26.     In mid-2010, CS1 spoke with COHEN about First Insurance. COHEN informed CS1 that IICRRG was short on working capital and COHEN needed the funds for operations and cash flow. COHEN further clarified that IICRRG and/or COHEN had obtained $7 million dollars in funding for policies submitted to First Insurance (not the $1 million CS1 had originally suspected). COHEN also stated to CS1 that the balances on the loans were almost paid in full.

9

27.    On or about March 6, 2014, your affiant received records from PNC Bank which showed that in or about December 2008, COHEN opened a bank account at PNC Bank with the name Monahan and O'Brien LLC. ███████████ On or around January 12, 2009, ███████ was added as an authorized signatory on that account.

28.    Federal agents have identified more than $10 million in funds that flowed from IDG to the PNC Bank Account associated with Monahan and O'Brien during 2009 and 2010. Money then flowed from Monahan and O'Brien to First Insurance through a series of ACH debits to the account. Federal agents have found spreadsheets that make it appear that at least as to 2009, the amounts related to the First Insurance financing were booked as revenue. Your affiant and other federal agents submit that the Monahan and O'Brien account was created to deceive First Insurance and IICDCRRG's auditors.

29.    Your affiant has visited the Monahan and O'Brien website, www.monahanobrien.com, which states that Monahan and O'Brien operates in the State of Florida and specializes in accounting, tax prep, and financial services. Your affiant and other federal agents have researched business entity databases maintained by the State of Florida and could find not any indication that Monahan and O'Brien was registered or incorporated in Florida. Your affiant has also checked databases maintained by the State of Maryland and found no record of such an entity.

### C. Fraudulent Bank Confirmations To Auditors

#### a. Marcum & RBCI

30.    IICDCRRG and IICRRG had their financial statements for 2008, 2009, 2010, and 2011 audited by Marcum LLP ("Marcum").[12]

---

[12] Based on your affiant's review of the financial statements, it appears that the auditors would review the financial statements of the company for two years at a time, so in 2010, the auditor

31.     According to IICDCRRG's Audited Financial Statements for 2009 and 2010, COHEN supposedly made a capital contribution in 2009 of $10,000,990.[13] CS1 has advised your affiant that in 2009, A.M. Best was threatening to downgrade its rating of IICDCRRG unless there was an additional capital infusion. CS1 advised that this request was the genesis of the $10 million capital contribution COHEN made in 2009.

32.     Based on documents received from Marcum, and located specifically within the 2009 audit workpapers related to its audit of IICDCRRG, your affiant believes that Marcum sought to verify the approximately $10 million capital contribution. Your affiant has obtained what purports to be a bank confirmation for IICDCRRG at RBCI, listing Account No. 801-665-2 as having an account balance of $10,000,000. The document further shows that Marcum obtained this verification directly from RBC International, which Marcum believed to be located at 3440 Hollywood Blvd, Suite 415, Hollywood, Florida, 33021. The bank confirmation was signed by an individual whose name is illegible but appears to have a last name of Seta or Setal, and was listed as the VP of Commercial Markets.

33.     Your affiant has obtained copies of a similar confirmation in the 2010 audit workpapers dated February 4, 2011 from Marcum. This confirmation purports to show a balance in Account ▮▮▮▮6652 at RBC of $10 million. It is stamped "RBC Government Demands." It bears the email address governmentalaffairs@rbcionline.com.

34.     The IICRRG financial statements show that in 2011, COHEN supposedly received $10,000,990 in a return of capital distribution from IICRRG.

---

would review the financial statements of IICDCRRG for 2008 and 2009. It is your affiant's understanding that IICDCRRG became IICRRG around the Fall of 2010.

[13] Interestingly, the 2009 financial statements also reflected premium related amounts owed by The Agency to IICRRG in the amount of $11,790,031. This likely led to the eventual accounts receivable in 2012 that the Delaware Insurance Commissioner determined was uncollectible.

35.    Your affiant has not been able to identify any financial institution located at 3440 Hollywood Blvd, Suite 415, Hollywood, Florida, 33021. In fact, that location appears to be occupied by a business called Hollywood Executive Office Suites, which leases office space for professionals.

36.    Federal agents have researched the creation of the domain name "RBCIOnline.com." An individual assigned "Shopper ID" number 32192629 created this domain through GoDaddy on December 5, 2009. GoDaddy contact information for Shopper ID number 32192629 reveals the owner to be COHEN. In addition, the contact information for Shopper ID number 32192629 lists COHEN's current known address in Reisterstown, Maryland and COHEN's known email address of cohentoyz@yahoo.com.

37.    Marcum relied upon the RBCI confirmation of $10 million in verifying the audited financial statements of IICDCRRG for 2009 and 2010.

            b.    **BDO & RBC-Barbardos**

38.    IICRRG had its financial statements for 2012 audited by a nationally recognized accounting firm, BDO USA, LLP ("BDO").

.39.    Your affiant has obtained records showing that in or about February 2012, in connection with BDO's review of IICRRG's year-end financial statements for 2011, BDO received a bank confirmation form purportedly confirming that IICRRG had at least $5 million on deposit at RBC Commercial ("RBC"). BDO relied on the information on the bank confirmation in preparing IICRRG's 2012 audited financial statement.[14]

---

[14] Federal agents have spoken with a representative of BDO, who advised that BDO is still looking into how BDO received the confirmation. The form has a place for COHEN and/or an authorized representative of IICRRG to authorize the bank to release information to BDO, and a place for the bank to confirm details regarding IICRRG's account and sign the form. Both parts of the form are filled out.

40.     Your affiant has obtained a copy of the alleged RBC account confirmation provided to

BDO. The confirmation listed the balance in Account No. ██████5652 as $5,097,276.  The bank

confirmation purported to have come from "█████████" with "RBC Commercial," was

dated March 1, 2013, and listed an email address of governmentalaffairs@rbcionline.com.

Included on the form was an authorization from COHEN, authorizing BDO to confirm with RBC

the balance in IICRRG account.

41.     The confirmation provided to BDO also listed an e-mail address for "████████"

with "RBC Commercial" of governmentalaffairs@rbcionline.com.  The website

"rbcionline.com" automatically redirects computer users to domain name

"rbc.com/carribbean.html," which is a legitimate website related to the Royal Bank of Canada.

42.     As indicated above, based on the domain in the email address governmentalaffairs@

rbcionline.com, your affiant believes COHEN engaged in an elaborate plot to create a fake

domain, mimic the actions of a legitimate banking entity, and create false account verifications.

43.     Moreover, a federal agent in the investigation conducted a review of the electronic

metadata pertaining to the bank confirmation received by BDO.  The metadata revealed that

█████████'s signature on the document, the date of the signature, and ████████'s title were created

by the user of a computer assigned username "jcohen."

### D. False Statements To The Delaware Insurance Regulators Regarding $5 Million IICRRG Allegedly Had On Deposit At Susquehanna Bank.

44.     As stated earlier, the Delaware Insurance Commissioner actively regulates IICRRG.

Your affiant's investigation has developed ample evidence that IICRRG engaged in interstate

business.  Accordingly, during the time period November 2010 to August 2013, when COHEN

operated IICRRG, COHEN qualified as a person actively operating an insurance business

affecting interstate commerce.  Pursuant to Delaware state insurance laws and regulations,

IICRRG and COHEN had to submit quarterly unaudited financial statements to the Delaware insurance regulators.

45. In the Summer of 2012, as part of the ongoing investigation by the Delaware Insurance Commission, COHEN represented to the regulators that IICRRG had $5,100,000 in unencumbered cash on deposit. COHEN and IICRRG also made representations regarding this $5 million in IICRRG's 3rd Quarter 2012 Financial Statement, which was filed with Delaware insurance regulators.

46. COHEN and IICRRG initially failed to identify the bank at which the cash was on deposit. In a letter dated January 31, 2013, COHEN represented that the $5 million in unencumbered cash was on deposit at Susquehanna Bank and stated that the bank had not previously been identified due to "unscrupulous entities attempting to harass [IICRRG's] banking partners" and also "on advice of counsel." COHEN further represented that he was the source of the $5 million on deposit.

47. The Delaware insurance regulators then sought to confirm that the unencumbered cash was on deposit. On February 28, 2013, a Delaware insurance regulator representative sent an email to COHEN requesting written authorization so Delaware could confirm the bank account titled "Bank 4" on Schedule E – Part 1 of IICRRG's 3rd Quarter 2012 Financial Statement.[15]

48. In March 2013, COHEN and the Delaware regulators engaged in a series of emails regarding Susquehanna Bank confirming the amount IICRRG had on deposit. During these communications, COHEN claimed among other things that Susquehanna Bank only offers "a P.O. box for mail confirms," that Susquehanna Bank could confirm by email if the regulators used the email address ██████@susquehanna-bank.com, and that he thought it would be

---

[15] Based on internal IICRRG documents, the Delaware insurance regulators believe that COHEN's January 31, 2013 letter was false and that the reference to "Bank 4" in the Q3 2012 Financial Statement was actually a reference to RBC not Susquehanna Bank.

advantageous to use email to speed up the confirm response and to avoid a $75 fee charged by Susquehanna Bank to IICRRG for the confirmation.

49.    Eventually, the Delaware insurance regulators stated that they required a written mailing address for the confirmation. On April 1, 2013, COHEN sent the insurance regulators an email listing the following contact information for the bank confirmation: Susquehanna Bank, Confirmation Dept., PO Box 1183, Cockeysville, MD 21030. The Delaware insurance regulator then sent a confirmation by mail to the PO Box listed on the form supplied by COHEN.

50.    On April 22, 2013, the Delaware insurance regulators received what purported to be a fax from ███████ of Susquehanna Bank, as well as a purported account balance form from Susquehanna Bank. The fax coversheet contained the Susquehanna Bank's company logo. The fax listed a contact number for ███████, a Vice President with Susquehanna Bank, and an email address, ███████@Susquehanna-bank.com. The attached form confirmed that IICRRG had a bank account with a balance of $5.1 million.

51.    Delaware insurance regulators later determine that the fax and account balance verification submitted were fraudulent.

52.    On or about May 20, 2013, Susquehanna Bank informed the Delaware insurance regulators via written letter that the April 22, 2013 fax and attached balance confirmation were not sent by Susquehanna Bank. Susquehanna Bank also stated that (a) ███████ never signed the confirmation or sent the fax; (b) the email address listed for ██ on the fax coversheet, "███████@Susquehanna-bank.com," was not ███████ actual Susquehanna Bank email address; (c) Susquehanna Bank additionally did not own or use the domain name "Susquehanna-bank.com"; (d) Susquehanna Bank did not own, lease, rent or use P.O. Box 1183 in

Cockeysville, Maryland; and (e) Susquehanna Bank did not charge customers for responding to account confirmation requests.

53.     Susquehanna Bank further advised that although IICRRG had approximately $5 million in a bank account, those funds constituted proceeds of a loan and were "pledged in their entirety towards the Susquehanna loan.

54.     Additionally, federal agents have linked the email address (█████████@Susquehanna-bank.com), which was listed on the fake confirmation form, to COHEN.  GoDaddy provided federal agents with records revealing that a GoDaddy customer assigned "Shopper ID" number 61570527 created the domain name "Susquehanna-Bank.com" on March 6, 2013 through GoDaddy.  The contact info provided by Go Daddy for Shopper ID 61570527 is Jeff Cohen, 2422 Delmar Place, Fort Lauderdale, FL 33301, phone number 954-668-2246, with a birthdate of February 9.  GoDaddy payment records show that charges for Shopper 61570527 have been made to COHEN's VISA account ending in 9746, with an expiration date of 04/2014.  In addition Shopper ID 61570527 logged into the ████████@Susquehanna-bank.com on 3/18/2013.  Furthermore, GoDaddy captured the IP address of the customer creating this domain as 75.148.8.225.  Your affiant has obtained records from Comcast showing that the IP address 75.148.8.225, was a static IP address assigned to Insurance Designers of Maryland,[16] 950 Ridgebrook Road, Sparks, MD 21152 from in or about February 2013 to in or about June 2013.

55.     Furthermore, your affiant has determined that P.O. Box 1183, Cockeysville, Maryland, which was listed on the bank confirmation sent to the Delaware insurance regulators, was opened on or about March 18, 2013 by Jeff B. Cohen of "Susquehanna" (presumably a reference to Susquehanna Bank), with a listed address of 950 Ridgebrook Rd, Ste 1500, Sparks, MD 21152, the email contact address of jcohen@iicdc.com, a phone number 410-472-6000, a driver's

---

[16] This entity is controlled by COHEN.

license number of ▇▇▇▇2120,[17] and a vehicle registration/vehicle tag "RISKTKR." The

P.O. Box was closed on October 11, 2013.

56.     Your affiant submits that these facts demonstrate probable cause to believe that COHEN

created or caused to be created fictitious bank confirmations which misrepresented IICRRG's

financial information and status, and that these bank confirmations, as well as the underlying

false financial reporting to the Delaware Insurance Commissioner constituted materially false

statements to insurance regulators regarding an insurance business affecting interstate commerce.

### Additional Potential Frauds

57.     According to the Delaware Supreme Court, Delaware insurance regulators uncovered

evidence in 2012 and 2013 that IICRRG was carrying a $20 million receivable on its balance

sheets from IDG, which COHEN also controlled. The regulators concluded that this receivable,

which was material to the overall financial health of IICRRG, was likely uncollectible. In or

about 2013, the Delaware regulators reviewed IICRRG's financial status and determined that

IICRRG had total assets of $3 million and total liabilities exceeding $24 million. The receivable

arose because over a three year period IDG had collected premiums on behalf of IICRRG, but

had not remitted the premium monies to IICRRG.

58.     Delaware regulators also expressed concern in the Delaware litigation that IICRRG

falsely represented it was entitled to recover $983,000 of incurred insurance losses from a

reinsurer.

59.     Representatives of the Delaware regulators have advised federal agents that they have

evidence that IICRRG and COHEN falsely confirmed reinsurance IICRRG supposedly obtained

through an insurance broker, USRE, from SCOR, a well-known reinsurance company. The

---

[17] Your affiant has confirmed that Florida DMV records list this driver's license number as
belonging to COHEN.

confirmation, according to representatives of the Delaware Insurance Commissioner, bears indicia of fraud similar to those with the fraudulent bank confirmations discussed herein, including an email address through GoDaddy.com that can be linked to COHEN. The cumulative effect of the reinsurance documents, according to the Delaware representatives, was to misrepresent that IICRRG had approximately $1.3 million in reinsurance that was not actually available to pay claims.

**Additional Information About The Place To Be Searched**

60.     From 2005[18] to the Spring of 2012, according to the Delaware Supreme Court, IDG performed essentially all of the day-to-day operations of IICRRG, including providing employees, paying for utilities, and other services. In 2012, COHEN changed this arrangement, and IICRRG took over these operations functions. In reality, however, the office space, employees and computers used to handle IICRRG business remained unchanged. During this entire time, IICRRG/IICDCRRG and IDG operated out of the location to be searched in this warrant.

61.     Your affiant and other federal agents have spoken with representatives of the Delaware Insurance Commissioner. These representatives have advised that many files, including financial files and electronically stored records regarding IICRRG and other Cohen associated entities remain as of April 28, 2014 at the location to be searched: 950 Ridgebrook Road, Suite 1500, Sparks, Maryland. Some of the hard copy files are within locked file cabinets. Some of

---

[18] Based on your affiant's review of records maintained by the State of Maryland, your affiant has determined that from 2005 to 2007, IDG Companies' principal place of business was located at 300 Redland Court, Suite 105, Owings Mills, Maryland, and from 2007 to the present time, IDG Companies' principal place of business was 950 Ridgebrook Road, Suite 1500, Sparks, MD.

these file cabinets are located in a room that the Delaware Insurance regulators have advised contains multiple financial and accounting records.

62.   Representatives of the Delaware Insurance Commissioner have further advised that they have left COHEN's office space essentially unchanged from the time that he occupied it, with the exception of certain items of a personal nature that they returned to COHEN at his request. COHEN's personal office currently contains office equipment with hard copy files as well as a safe that the Delaware insurance regulators' representatives have not gained access to.

### Records In White Collar Fraud Investigations

63.   Based on your affiant's training and experience, your affiant knows the following in connection with the crimes being investigated in this case:

   a) Individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign financial institutions, and others, through various financial instruments, including cash, cashier's checks, money drafts, money orders, traveler's checks, wire transfers, etc. Records of such instruments are often maintained at the individual's residence or place of business.

   b) Individuals engaged in financial fraud often utilize electronic equipment such as computers, facsimile machines, telephone answering machines, pagers, cellular phones, and caller identification machines to generate, transfer, record and/or store the information needed to conduct their business, create false documents to be utilized in the fraud, and to account for and collect the payments and profits of the illegal operation.

   c) There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize that he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The criminal offender may also be under the mistaken belief that he/she has deleted, hidden or further destroyed any computer-related evidence that may be retrievable by a trained forensic computer expert.

## Computer Search Techniques and Information

64.    Based upon your affiant's training and experience and information related to me by other

federal agents and others involved in the forensic examination of computers, your affiant knows

that computer data can be stored on a variety of systems and storage devices including hard disk

drives, floppy disks, compact disks, magnetic tapes and memory chips.  Your affiant also knows

that during the search of the premises it is not always possible to search computer equipment and

storage devices for data for a number of reasons, including the following:

    a.  Searching computer systems is a highly technical process which requires specific
expertise and specialized equipment.  There are so many types of computer
hardware and software in use today that it is impossible to bring to the search site
all of the technical manuals and specialized equipment necessary to conduct a
thorough search.  In addition, it may also be necessary to consult with computer
personnel who have specific expertise in the type of computer, software
application or operating system that is being searched.

    b.  Searching computer systems requires the use of precise, scientific procedures
which are designed to maintain the integrity of the evidence and to recover
"hidden," erased, compressed, encrypted or password protected data.  Computer
hardware and storage devices may contain "booby traps" that destroy or alter data
if certain procedures are not scrupulously followed.  Since computer data is
particularly vulnerable to inadvertent or intentional modification or destruction, a
controlled environment, such as a law enforcement laboratory, is essential to
conducting a complete and accurate analysis of the equipment and storage devices
from which the data will be extracted.

    c.  The volume of data stored on many computer systems and storage devices will
typically be so large that it will be highly impractical to search for data during the
execution of the physical search of the premises.  A single megabyte of storage
space is the equivalent of 500 double spaced pages of text.  A single gigabyte of
storage space, or 1,000 megabytes, is the equivalent of 500,000 double spaced
pages of text.  Storage devices capable of storing 160 gigabytes (GB) of data are
now commonplace in desktop computers.  Consequently, each non networked,
desktop computer found during a search can easily contain the equivalent of 80
million pages of data, which, if printed out, would completely fill a 35' x 35' x 10'
room to the ceiling.  Further, a 160 GB drive could contain as many as
approximately 150 full run movies or 150,000 songs.

    d.  Computer users can attempt to conceal data within computer equipment and
storage devices through a number of methods, including the use of innocuous or

misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

65.     Based on your affiant's experience and consultation with other federal agents who have

been involved in computer searches, searching computerized information for evidence or

instrumentalities of a crime often requires the seizure of all of a computer system's input and

output peripheral devices, related software, documentation, and data security devices (including

passwords) so that a qualified computer expert can accurately retrieve the system's data in a

laboratory or other controlled environment. There are several reasons that compel this

conclusion:

a.   The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices; and

b.   In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU). Further, the analyst again needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

c.   Your affiant will involve the use of computer forensic examiners while executing warrants at the respective locations, in an attempt to image any and all computer related

media, software and servers on site. Based upon the size and amount of devices encountered, however, it may not be entirely possible to image everything on site. In the event that a device cannot be imaged on site, the device will be imaged off site at a forensic computer lab in the most expedient manner possible. While your affiant cannot guarantee the actual length of time it will take to image a device(s) off site, your affiant believes that eight (8) weeks would be a reasonable time frame to accomplish this task.

66.    The search procedure of the electronic data shall include the following techniques which shall be used to minimize the risk that those conducting the search will view information not within the scope of the warrant:

a)   surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

b)   "opening" or reading the first few "pages" of such files in order to determine their precise contents;

c)   "scanning" storage areas to discover and possibly recover deleted data;

d)   scanning storage areas for deliberately hidden files; and/or

e)   performing key word searches though all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation;

## SEALING OF SEARCH WARRANT AFFIDAVIT

67.    If the information contained in this affidavit is immediately made known to COHEN, such disclosure may have a significant and negative impact on this continuing investigation. Your affiant knows from her experience in other investigations that if individuals who are under investigation learn of this fact prior to being contacted by law enforcement then they may attempt to destroy or hide evidence and could also attempt to coordinate in advance the statements or information they provide law enforcement upon being contacted. Therefore, your affiant requests that the Affidavit in support of the Search Warrants be sealed until further order of the Court.

14-1038SAG

## CONCLUSION

Based upon the foregoing, I also submit that there is probable cause to believe that a search of the location identified above, and described with more particularity in Attachment A to this search warrant, will contain the evidence, fruits, and/or instrumentalities set forth more particularly in Attachment B, relating to a violation of 18 U.S.C. Sections 1349 and 1033(a). The United States, therefore, seeks the issuance of the search warrants authorizing the search of the location in Attachment A and permitting the seizure of the items described more particularly in Attachment B.


Jennifer Perry
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me this ___5th___ day of May 2014 at Baltimore, MD.


United States Magistrate Judge
Stephanie A. Gallagher

23



HMG/JKMcD:USAO#2013R00794

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Kob
9/16/14

CLERK'S OFFICE
AT BALTIMORE

BY _____

| | | |
|---|---|---|
| UNITED STATES | : | **CRIMINAL NO. WDQ-14-310** |
| v. | : | **(Wire Fraud; 18 U.S.C. § 1343;** |
| | : | **Money Laundering, 18 U.S.C. §** |
| JEFFREY BRIAN COHEN, | : | **1957; False Statements To An** |
| | : | **Insurance Regulator; 18 U.S.C.** |
| Defendant. | : | **§ 1033(a); Aiding and Abetting,** |
| | : | **18 U.S.C. § 2; Forfeiture, 18** |
| | : | **U.S.C. § 982)** |

...oOo...

## SUPERSEDING INDICTMENT

## COUNT ONE

The Grand Jury for the District of Maryland charges:

## INTRODUCTION

At times material to this superseding indictment:

1.     Defendant **JEFFREY BRIAN COHEN ("COHEN")** was the President and

Chairman of the Board of Indemnity Insurance Corporation RRG (hereinafter referred to as

"IICRRG").

2.     IICRRG was a Delaware corporation that acted as a "risk retention group," which

is a captive insurance company.  IICRRG was subject to extensive state regulation, in particular,

regulation by the Insurance Commissioner of the State of Delaware ("Delaware Insurance

Commissioner").

3.     **COHEN** previously controlled a District of Columbia corporation called

Indemnity Insurance Corporation of DC, Risk Retention Group ("IICDCRRG"), which was a

**Exhibit 2**

predecessor entity to IICRRG and operated as a risk retention group and captive insurance company subject to regulation by the Commissioner of the District of Columbia Department of Insurance, Securities and Banking ("DC Insurance Commissioner").

4.     IICRRG and IICDCRRG were located at 950 Ridgebrook Road, Suite 1500, Sparks, Maryland.

5.     Both IICRRG and IICDCRRG provided general liability insurance, liquor liability insurance, and excess liability insurance coverage to their customers and policy holders, which were individuals and companies involved in the entertainment industry, such as nightclubs, concert tours, and special events.

6.     IICRRG and IICDCRRG operated in many jurisdictions within the United States, including California, Connecticut, Delaware, the District of Columbia, Florida, Pennsylvania, Maryland, New Jersey, New York, Nevada, Virginia, and Texas.

7.     In or about 2012, IICRRG insured more than 3,000 policyholders, and collected over $25 million in premiums.

8.     The Delaware Insurance Commissioner and the DC Insurance Commissioner were charged by law with the responsibility of protecting insurance policyholders and the general public by regulating insurance companies and risk retention groups and their products to ensure among other things, that insurance companies and risk retention groups have the ability to pay claims.

9.     Pursuant to the laws and regulations of Delaware and the District of Columbia, IICRRG and IICDCRRG had to submit quarterly unaudited financial statements to the Delaware Insurance Commissioner and the DC Insurance Commissioner, respectively.  In addition, IICRRG and IICDCRRG had to submit yearly financial statements audited by independent

2

accounting firms along with the opinion of the accounting firm on whether the financial statement of the insurance company stated its financial position in accordance with Generally Accepted Accounting Principles (GAAP). In addition, the Delaware Insurance Commissioner and the DC Insurance Commissioner had the authority to conduct their own financial examinations of IICRRG and IICDCRRG.

10.     A.M. Best, which was headquartered in Oldwick, New Jersey, was an independent insurance rating agency which developed its own ratings for insurance companies and risk retention groups such as IICRRG and IICDCRRG.

11.     Marcum LLP ("Marcum") and BDO USA LLP ("BDO") were independent accounting firms that provided auditing services to many publicly traded as well as private companies, such as IICRRG and IICDCRRG.

12.     BNP Paribas and the Royal Bank of Canada ("RBC") were large financial institutions based outside the United States.

13.     RBC Bank was a division of the RBC, had its headquarters in North Carolina, and had its deposits insured by the Federal Deposit Insurance Corporation ("FDIC"). In or about June 2011, PNC Bank purchased RBC Bank.

14.     First Insurance Funding ("First Insurance") was located in Northbrook, Illinois. First Insurance was one of the largest premium finance companies in the United States, and provided loans to persons or entities who sought to finance the costs of insurance premiums. In connection with a premium financing agreement, an individual or company typically signed a premium finance agreement, First Insurance paid the insurance premium to the insurer, such as IICRRG, and the customer repaid the amount of the premium payment, plus interest, to First Insurance.

3

15.     SCOR Reinsurance Company was a French based financial services company that sold reinsurance policies to insurance companies, such as IICRRG and IICDCRRG, to allow the insurance companies to reduce their exposure to financial risk by transferring the risk to the reinsurance company.

16      U.S. RE Corporation was a company headquartered in Pearl River, New York, which brokered reinsurance policies issued by other companies, such as SCOR Reinsurance Company, to insurance companies, such as IICRRG and IICDCRRG, to allow the insurance companies to reduce their exposure to financial risk.

17.     The Light Group LLC ("Light Group") was a company that operated and managed multiple Las Vegas nightclubs and lounges located within properties owned by MGM Resorts International, such as the Bellagio Casino and Hotel and Mandalay Bay. The Light Group was required to purchase insurance from companies meeting certain liquidity and size requirements.

18.     Susquehanna Bank had its deposits insured by the FDIC and operated in multiple states, including Maryland.

19.     GoDaddy.com was a Delaware corporation that provided internet domain registration, website hosting, and other internet related services to customers.

20.     Individuals and companies seeking to establish a website or email domain had to register the domain name with a domain name registrar, such as GoDaddy.com.

4

## OTHER COHEN ENTITIES

21.     **COHEN** had a controlling ownership interest in a complicated web of different

companies, including but not limited to the following:

       a)  RB Entertainment Ventures, LLC ("RB Entertainment"), which was
          incorporated in Delaware and was a 99% owner of IICRRG;

       b)  LMNH Inc. ("LMNH"), which was a Delaware holding company for the risk
          bearing entities that **COHEN** operated.  **COHEN** owned 100% of LMNH;

       c)  The Agency, LLC ("The Agency"), which was an insurance producer, owned
          by IDG, incorporated in Delaware, and licensed in Maryland from in or about
          August 2006 to in or about February 2014; and

       d)  IDG Companies, LLC ("IDG"), which was a Delaware company, based in
          Sparks, Maryland, and formed in or about June 2006.  **COHEN** was the sole
          member of IDG and its President.

## THE SCHEME TO DEFRAUD AND ITS OBJECTS

22.     Beginning in or about January 2008, and continuing until in or about the fall of

2013, in the District of Maryland and elsewhere,

### JEFFREY BRIAN COHEN,

the defendant herein, did knowingly and willfully devise and intend to devise a scheme and

artifice to defraud insurance policyholders and prospective insurance policyholders, and to obtain

more than $100 million in insurance premiums, by means of materially false and fraudulent

pretenses, representations, and promises, regarding the financial status of IICDCRRG, IICRRG,

and other **COHEN** controlled entities to insurance policyholders, prospective insurance

policyholders, A.M. Best, BDO, Marcum, the DC Insurance Commissioner, and the Delaware

Insurance Commissioner.

## OBJECT OF THE SCHEME TO DEFRAUD

23.     It was the object of the scheme to defraud for **COHEN** to misrepresent the

financial status of IICDCRRG and IICRRG to the DC Insurance Commissioner and the

Delaware Insurance Commissioner, IICDCRRG's and IICRRG's independent accounting firms,

Marcum and BDO, and the rating agency A.M. Best, to secure authority to operate as an

insurance company and a favorable rating, so that **COHEN** could market insurance policies to

policy holders and prospective policy holders, and obtain premium payments that **COHEN** could

use to operate his businesses and enrich himself.

## MANNER AND MEANS

### Financial Rating Agency and Auditors

24.     It was part of the scheme to defraud that **COHEN**, IICRRG and IICDCRRG

obtained financial ratings from A.M. Best and touted the A.M. Best ratings to potential

policyholders, policyholders, and regulatory agencies.

25.     It was part of the scheme to defraud that **COHEN** transmitted and caused to be

transmitted false and fraudulent documents to A.M. Best in order to obtain financial ratings for

IICDCRRG and IICRRG that were not based on the companies' true financial condition.

26.     It was part of the scheme to defraud that **COHEN** transmitted false and fraudulent

emails, management representation letters, financial statements, and other documents to Marcum

and BDO so the auditors would provide an unqualified audit opinion on IICDCRRG and

IICRRG financial statements that **COHEN** then and there knew were false and fraudulent.

27.     It was part of the scheme to defraud that **COHEN** created, and caused to be

created, false and fictitious financial documents, including but not limited to the following:

6

a) A March 2008 bank statement, purportedly from RBC Centura Banks, Inc., showing that LMNH had a bank account ending in 6654 with an account balance of $12,533,657.29.

b) A letter of credit, number BPW700-11A-IIC-1, purportedly issued on or about May 27, 2009, to the DC Insurance Commissioner by BNP Private Services Private Wealth Advisors, Ltd., in favor of IICDCRRG, up to the aggregate amount of $47 million, and expiring on December 31, 2009.

c) A January 2009 bank statement, purportedly from BNP Paribas, reflecting that LMNH had an account balance of $47,595,968.95.

d) A bank confirmation from a fictitious entity called RBCI, purportedly showing that IICDCRRG had a bank account ending in 6652 with a balance of $10 million as of December 31, 2009.

e) A bank confirmation dated February 4, 2011, purportedly from RBC Government Demands, showing that IICDCRRG's bank account ending in 6652 had a balance of $10 million.

f) A bank confirmation dated February 21, 2012, purportedly from RBC Government Demands, showing that IICRRG's bank account ending in 6652 had a balance of $1,450,293.

g) A bank confirmation dated March 1, 2013, purportedly from RBC Government Demands, showing that IICRRG's bank account ending in 6652 had a balance of $5,097,276.

h) A bank confirmation dated April 22, 2013, supposedly from Susquehanna Bank, showing that IICRRG had $5.1 million in unencumbered cash on deposit at the bank.

**False Representations To Insurance Policyholders And Potential Insurance Policyholders**

28.    It was part of the scheme to defraud that **COHEN** obtained money and attempted to obtain money from insurance policyholders and potential insurance policyholders of IICDCRRG and IICRRG based on financial ratings, financial audits, and insurance regulatory approvals that **COHEN** fraudulently obtained.

29.    It was part of the scheme to defraud that **COHEN** caused IICDCRRG and

7

IICRRG to write insurance policies exceeding the companies' financial ability to pay in the event of a liability determination.

30.    It was part of the scheme to defraud that **COHEN** altered and caused to be altered reinsurance documents obtained from companies involved in reinsurance, such as U.S. RE Corporation and SCOR Reinsurance Company.

31.    It was part of the scheme to defraud that **COHEN** caused IICDCRRG and IICRRG to make false and fraudulent representations to insurance policyholders and potential insurance policyholders concerning the financial resources available to IICDCRRG and IICRRG from reinsurance companies, such as SCOR Reinsurance Company, in the event of a large insurance liability determination.

**Premium Financing**

32.    It was part of the scheme to defraud that **COHEN** opened a bank account in the name of Monahan and O'Brien LLC ("M&O") at RBC Bank.

33.    It was part of the scheme to defraud that **COHEN** sent false and fraudulent emails from his email account jcohen@iicdc.com to First Insurance.

34.    It was part of the scheme to defraud that **COHEN** falsely claimed to First Insurance that M&O was a business manager handling several large artists.

35.    It was part of the scheme to defraud that **COHEN** claimed to First Insurance that M&O was a business located at 1314 East Las Olas Blvd Suite 615, Fort Lauderdale, FL 33301 when **COHEN** then and there knew that the address was the location of a mailbox he had rented.

36.    It was part of the scheme to defraud that **COHEN** prepared false and fraudulent premium financing applications on behalf of business entities, which he caused to be submitted

8

to First Insurance, even though these entities had not applied to IICDCRRG or IICRRG for

insurance or financing.

37.      It was part of the scheme to defraud that **COHEN** claimed to First Insurance that

the insureds' business manager, M&O, would repay the premium financing loans, plus interest,

on behalf of the loan applicants, when **COHEN** then and there knew that he controlled M&O,

the supposed insureds were not purchasing these policies, and in certain cases, the supposed

insureds were fictional entities.

38.      It was part of the scheme to defraud that business entities controlled by **COHEN**

obtained more than $9 million through the premium financing loans made by First Insurance.


**Insurance Regulators**

39.      It was part of the scheme to defraud that **COHEN** caused IICDCRRG and

IICRRG to issue insurance policies exceeding the coverage limits authorized by the DC

Insurance Commissioner and the Delaware Insurance Commissioner.

40.      It was part of the scheme to defraud that **COHEN** transmitted and caused to be

transmitted false and fraudulent audited and unaudited financial statements for IICDCRRG and

IICRRG to the DC Insurance Commissioner and the Delaware Insurance Commissioner.

41.      It was part of the scheme to defraud that **COHEN** made false statements to

representatives of the Delaware Insurance Commissioner concerning the financial status of

IICRRG, the financial institutions at which IICRRG had funds, and the contact information for

the financial institutions of IICRRG.

9

## THE CHARGES

42.     On or about the dates set forth below, in the District of Maryland and elsewhere,

## JEFFREY BRIAN COHEN,

the defendant herein, for the purpose of executing and attempting to execute the scheme and

artifice to defraud described above, did knowingly transmit and cause to be transmitted in

interstate commerce by means of a wire communication, certain signals, signs and sounds, that is

the following emails, with attached financing applications:

| COUNT | DATE | DESCRIPTION | INTERSTATE WIRE COMMUNICATION DETAILS |
|-------|------|-------------|---------------------------------------|
| 1 | 11/06/2009 | Email from jcohen@iicdc.com to [intentionally omitted] @firstinsurancefunding.com, regarding premium financing of $630,375 | Sparks, Maryland to Villa Park, Illinois |
| 2 | 01/26/2010 | Email from jcohen@iicdc.com to [intentionally omitted] @firstinsurancefunding.com, regarding premium financing of $995,235 | Sparks, Maryland to Villa Park, Illinois |
| 3 | 6/25/2010 | Email from [intentionally omitted] @marcumllp.com to jcohen@iicdc.com, among others, which transmitted the Financial Statements of IICDCRRG for 2008 and 2009, and specifically referenced a letter of credit in the amount of $47 million | Melville, New York, to Sparks, Maryland |
| 4 | 12/9/2010 | Email from jcohen@iicdc.com to [intentionally omitted] @ambest.com, enclosing a copy of the A.M. Best rating for IICDCRRG, dated December 9, 2010 | Sparks, Maryland to Oldwick, New Jersey |
| 5 | 12/17/2012 | Email from jcohen@iicdc.com to multiple individuals working at BDO and using email addresses ending in bdo.com, and attaching documents regarding bank accounts | Sparks, Maryland to Grand Rapids, Michigan |

18 U.S.C. §1343
18 U.S.C. § 2

## COUNTS SIX & SEVEN

The Grand Jury for the District of Maryland further charges that:

1.     Paragraphs 1-41 of Count One of this Superseding Indictment are hereby incorporated by reference as though fully set forth herein.

2.     On or about dates listed below, in the District of Maryland and elsewhere,

### JEFFREY BRIAN COHEN,

the defendant herein, did knowingly engage, and attempt to engage, in the monetary transactions listed below, by, through and to a financial institution, affecting interstate commerce, in criminally derived property having a value greater than $10,000, such property having been derived from a specified unlawful activity, that is wire fraud, in violation of 18 U.S.C. § 1343:

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| 6 | 2/17/2010 | A wire transfer in the amount of $666,666.67 from a Fidelity Bank account in the name of IDG to a Bank Leumi USA account in the name of a law firm. |
| 7 | 4/15/2010 | A wire transfer in the amount of $200,000 from a Fidelity bank account in the name of IDG to a PNC Bank account in the name of **COHEN**. |

18 U.S.C. §1957
18 U.S.C. § 2

12

## COUNTS EIGHT - TWELVE

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1-41 of Count One of this Superseding Indictment are hereby incorporated by reference as though fully set forth herein.

2.      On or about March 6, 2013, **COHEN** used the services of GoDaddy to create the internet domain "Susquehanna-Bank.com."

3.      On or about March 18, 2013, **COHEN** entered into a rental contract with the United States Postal Service ("USPS") to use PO Box 1183, Cockeysville, Maryland.  In his application, **COHEN** used the name "Susquehanna," with a listed address of 950 Ridgebrook Rd, Ste 1500, Sparks, MD 21152.

4.      On or about the dates set forth below, in the District of Maryland and elsewhere,

### JEFFREY BRIAN COHEN,

the defendant herein, was engaged in the business of insurance affecting interstate commerce, and did knowingly, willfully, and with the intent to deceive, make materially false statements and reports, and materially overvalue property and security, as set forth below, in connection with a financial report and documents presented to the Delaware Insurance Commissioner and her agents, for the purpose of influencing the actions of the Delaware Insurance Commissioner and her agents.

| COUNT | DATE | FALSE STATEMENT AND OVERVALUATION OF PROPERTY |
|---|---|---|
| 8 | 11/15/2012 | **COHEN** caused IICRRG to file its unaudited financial statements for the third quarter of 2012 with the Delaware Insurance Commissioner, which stated that IICRRG had $5.1 million in unencumbered cash on deposit at "Bank 4." |

13

| 9 | 1/31/2013 | **COHEN** sent a letter to the Delaware Insurance Commissioner and Delaware Insurance Regulators which stated that IICRRG had $5.1 million in unencumbered cash on deposit at Susquehanna Bank. |
|---|---|---|
| 10 | 3/18/2013 | **COHEN** sent an email to the Delaware Insurance Regulators stating that Susquehanna Bank only offered "a P.O. Box for mail confirms," and further that Susquehanna Bank could confirm the balance in the IICRRG account if the regulators corresponded with the email address "[name intentionally omitted]@susquehanna-bank.com." |
| 11 | 4/1/2013 | **COHEN** sent an email to the Delaware Insurance Regulators attaching a confirmation form stating that the mailing address for written account confirmations by Susquehanna Bank was the following:  Susquehanna Bank, Confirmation Dept., PO Box 1183, Cockeysville, MD 21030 |
| 12 | 4/22/2013 | **COHEN** caused a fax to be submitted to the Delaware Insurance Commissioner and Delaware Insurance Regulators that stated Susquehanna Bank had confirmed that IICRRG had $5.1 million in unencumbered cash on deposit at Susquehanna Bank |

18 U.S.C. § 1033(a)
18 U.S.C. § 2

## FORFEITURE

1.      The allegations contained in Counts One through Seven are realleged and incorporated here for the purpose of alleging forfeiture.

2.      Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with  Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction under Counts One through Five of the Superseding Indictment.

3.      As a result of the offenses set forth in Counts One through Five, the defendant,

**JEFFREY BRIAN COHEN,**

*shall* forfeit to the United States all property, real or personal, which constitutes or is derived from proceeds traceable to the offense, including **$100,000,000** and all interest and proceeds traceable thereto.

4.      Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982, in the event of the defendant's conviction under Counts Six and Seven of the Superseding Indictment.

5.      As a result of the offenses set forth in Counts Six and Seven, the defendant,

**JEFFREY BRIAN COHEN,**

shall forfeit to the United States any and all property involved in and traceable to the property involved in such offenses, including **$866,667.67** and all interest and proceeds traceable thereto.

## SUBSTITUTE ASSETS

6.        If any of the **$100,000,000** and **$866,667.67** described  in this Superseding

Indictment as being subject to forfeiture, as a result of any act or omission of the defendant,

### JEFFREY BRIAN COHEN,

(a) cannot be located upon the exercise of diligence;

(b) has been transferred, or sold to, or deposited with a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be subdivided without

difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code §§ 981 and 982,

Title 21, United States Code § 853, and Title 28, United States Code § 2461, to seek forfeiture of

any other property of the defendant up to the value of **$100,866,666.67**.

18 U.S.C. § 981
18 U.S.C. § 982
21 U.S.C. § 853
28 U.S.C. § 2461

Rod  J.  Rosenstein/bmg
_____
ROD J. ROSENSTEIN
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED** _____   Date: 9/16/14

16